Now turn to our fourth case on the docket, 22-1118, Brayman v. Keypoint Government Solutions. Ms. Hogan? 1168? I have 1118. No. They're two consolidated cases. It is consolidated, Your Honor. 1118 and 1168. I should have called both numbers. Okay. May it please the Court, my name is Margaret Parnell Hogan and I represent Appellant Keypoint Government Solutions, Inc. in this consolidated appeal. With the Court's agreement, I would like to reserve three minutes for rebuttal. With respect to Keypoint's Rule 23 appeal, the District Court below erred when it applied the wrong legal standard contrary to binding precedent in Dukes v. Walmart and when it held, without any analysis, that that common issue is predominated over the overwhelmingly individualized circumstances of the plaintiffs. Indeed, plaintiffs' motion for Rule 23 certification stated that the Rule 23a requirement, and quotes important language in Dukes, quote, the thrust of the commonality requirement is the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation, end quote. Dukes prohibits certifications of questions that cannot produce common answers and the evidence, which the District Court failed to rigorously analyze, shows that liability is incapable of being established on a class-wide basis through common answers. And Dukes requires that the Court do more than simply say it reviewed all the evidence. The District Court was required to do more here and failed to. The District Court below ought to have done what the Central District of California did in Pittman v. CACI International, a case with the same plaintiff's law firm, the same allegations, with strikingly analogous facts, and a defendant that, like Keypoint, engages work-from-home investigators to perform background investigations for the federal government. The importance of that last fact cannot be overstated. Keypoint's field investigators conduct security clearance investigations for the government throughout the country, working from their homes with the express understanding that they arrange their own schedules, report their time and meal and rest breaks, and as they need and see fit, balance their personal obligations around their work schedules. It is undisputed that the investigators can and do flex their work time around their personal needs, picking up children from school, keeping medical or other personal appointments, and even doing shopping. Critically, Keypoint's policies governing its employees' overtime and meal and rest break practices are also indisputably lawful. Faced with this unhelpful fact, plaintiffs seek to fashion a theory that lawful performance expectations constitute an unlawful policy because plaintiffs individually elected to both violate those policies and hide that fact from their managers. This simply cannot be the standard. As a threshold matter, there is nothing illegal about performance requirements for workers. Tellingly, plaintiffs have failed to provide any evidence beyond individualized and self-serving testimony that these performance requirements were even onerous, even assuming that they were. When you say self-serving, the common testimony on cases like this is self-serving. It comes from the people that are experiencing it. So I'm not sure that that's a, I mean, if we applied that as a litmus test for cutting out testimony, we wouldn't have much. Well, Your Honor, but it is not illegal to have a productivity standard. And the fact that these plaintiffs, these opt-ins who elected to opt into the FLSA collective and then are from California, found it to be onerous, is self-serving. Even assuming that these performance requirements were onerous, though, each plaintiff's decision to violate the company's policies and to hide the fact from management that they did so was individualized in nature. Well, let me let me look at it from this perspective. The, all the plaintiffs say they violated the requirements and worked overtime without reporting or didn't take rest breaks or didn't take lunch time. The issue is knowledge by key point. Is that not right? Isn't that really the working overtime without reporting or violating other standards? So first, first, Your Honor, not all of the opt-ins plaintiffs here say that they didn't get all of their breaks. There are some, as we look through the evidence, that do report that they got their meal and rest breaks. Some of them say that they, in their interrogatory responses, say that they did not. But they all say one of the three they didn't get over time. They may have worked off the clock. I think your point is, Your Honor, most of these plaintiffs say that they either worked off the clock or missed real meal and rest breaks. And Your Honor is correct. Liability is established, in particular, if we look at off-the-clock work. Liability is only established when the employer knew or should have known. And the record shows, Your Honor, that these individuals who either submitted interrogatories or actually a small sample was testified, that they hid that fact from their employer. They specifically didn't tell them that they were working off the clock. Natalie Mendez is an specific that shows that Key Point must have known this was happening or, in fact, knew that this was happening. That would probably satisfy the predominance requirement, commonality and predominance requirement, would it not? If there were evidence that was not specific to a particular worker that indicated that Key Point knew this, knew that they were having to do this or were doing this, that would probably satisfy both the commonality and predominance. If it were common, Your Honor, but it clearly is not. If they had a statement from the president of the company saying we do this. Right. That hypothetical, in that case, Your Honor, which of course didn't exist here. Well, there's one fact here that does seem to fit that. I'd like you to respond to it. The same requirements for earning points applied throughout the country. You had standards, whether it was rural or urban area in which you worked and a couple other factors, but those were not peculiar to one part of the country. They were universal. Am I basically correct? The source unit expectations were divided by Metro or non-Metro. Okay, and whether it was a Metro in Georgia or a Metro in Minnesota or whatever, right? There was one difference, though, and that's with respect to the rest breaks, because California required that the employees take the rest break. Right. But they got no credit for points for rest breaks with Key Point. So Key Point knew, had to know, that it was requiring California workers to do in seven and a half hours what the workers elsewhere in the country needed eight hours to do or were given eight hours to do. Am I wrong in that characterization of what happened? Because it looks like that would be a common fact. You don't need to know anything about a specific worker, and that might be the key fact, might predominate. So respond to that, if you would. Certainly, Your Honor. I think it skips a key step, which is that under California law, they have to be permitted. They could choose not to. They could choose not. The employer needed to possible for them to take these breaks, and all of these individuals did. That is common. They all controlled their own schedules, so they had the ability to do so. If they chose not to, and that's one of the key individual issues here, Your Honor. If they chose not to take that break, we need to know why. They have to answer that question why. Yes, and they chose not to because they were given requirements that were identical to the rest of the country that everybody outside of California had eight hours to do. They knew they couldn't do it in seven and a half hours if they took the rest breaks, so they were pressured not to take those rest breaks, and KeyPoint was at least on notice, maybe more than that. Maybe it constructed knowledge that this had to be happening. I would argue that they're not, Your Honor, for a couple reasons. First of all, all of these individuals, all KeyPoint employees submit and certify that the time sheets that they reiterate constantly. In California, that includes recording your meal and rest breaks. That is certified that it is a true statement of all-time work, and they are told that if they falsify that, that is grounds for termination. But also, Your Honor, I would point, as pointed out in the record, there are several individuals already who are opt-ins who have said that they hypothetical. They are able to do it. Megan Hagen, volume... That's not troublesome that the requirement for California workers are to do in seven and a half hours what the rest of the country is given eight hours to do? That's not... But that's not the law here, Your Honor. Again, if I could just finish with respect to Megan Hagen, volume... Appendix volume 23 at 5950, she said that she took three 10-minute breaks each day. So she took more than would normally be... These were 10-minute breaks. I was thinking 15. So it's two 10-minute breaks is what's required in California, is that right? Yes. That was in her deposition?  Okay. We were not allowed to take all the depositions by court order. Is that in the appellate record? It is, Your Honor. Ms. Hagen is at, again, appellate volume 23 at 5950. Also, Jamie Bartz at 5867, Michael Cameron at 5903, Larry Houston at 5903. Did these folks who took rest breaks, did they also state that they worked off the clock with respect to overtime? In different interrogatory answers, some of them did. I was focusing, Your Honor, on the meal and rest break. No, no. But if... I mean, it's like pushing a balloon on one end and it goes out the other. They can't do the work in seven and a half hours. They take the rest breaks, but then they have to work more than the eight hours. As we get to the... As we turn to the off-the-clock break, Your Honor, or excuse me, the off-the-clock allegations, again, one of those key requirements is knowledge, either should have known or known. But we have, as an example, again, from the record, Natalie Mendez at... The appellate record is 24 at 6269 to 6270 in her deposition, being asked specifically whether or not Key Point... Anyone at Key Point ever encouraged you work off the clock or to work hours that you didn't require... Excuse me, record? And the answer was no. What does the record show in terms of employees complaining to their managers about the impact of these policies on their ability to meet their quotas? Wouldn't that be a source of knowledge evidence? Sure. And with respect... So in this instance, the field investigators report to field managers. So that would be their supervisor, Your Honor. And with respect to that, Priscilla Norton testified that she, with respect to her field manager, Tim, questioned, did you ever tell Tim that you were working hours that you weren't recording in order to get your work done? Answer, no. And that's found at appendix 24 at 6258. Was there evidence going the other way? Specifically telling their field managers, no, Your Honor. I see that my reserve time is a little bit over. Unless the court has... I'd like to reserve my remaining time for rebuttal, unless the court has other questions for me at this moment. Thank you, Your Honor. Good morning. May it please the court. My name is Anna Prakash and I represent the plaintiff appellees, Rachel Brayman, Adriana Ponce, Dana McCarthy, and the certified Rule 23 class. My colleague, Caroline Bressman, is going to address the arbitration issue and I will start with class certification. And let me get straight to what my colleague was just talking about, which is knowledge, common proof of knowledge, as well as what it means to have some variation in the class. Because I think all of those things together show that there was not an abuse of discretion world and not a different world where we're looking at de novo review. So with respect to knowledge, yes, Judge Hart, you hit the nail on the head. We are talking about a practice that is universal across the country. And in California, they are not getting credit for taking meal and rest breaks. Now, here is the knowledge that is in the record that I think supports predominance. This is a single defendant company. We are not talking about franchises. Yes, there are 15 different field managers, but they all report to a single regional manager for California. And the record reflects, and this is in volume six, that the regional manager is saying, let's make sure that all overtime is productive from this point forward. He is saying in emails that are in the record that overtime is not used to catch up. So if people aren't getting their work done and they can't use overtime to catch up, how are they getting that work done? Well, let me just ask you about the if part of that statement. Could you just spell out for us what your evidence was for class certification to show that each employee worked unpaid overtime? How can you show on a class-wide basis that each member of the class actually did work unpaid overtime? So respectfully, Your Honor, I don't believe that we need to have 100 percent predominance. In other words, all 400 members of the class worked overtime to have a certified class. How many do you need? 90 percent? So there is no bright line rule, right? Tell us how you get to your maximum percentage. What is the evidence to show on a class-wide basis that they worked unpaid overtime? So let me start with the 62 California opt-in plaintiffs who are members of the class and did written interrogatory responses. All 62 say that they worked more than eight hours in a day. 43 of the 62 say that they did not receive all required rest breaks. 61 of the 62 say that they did not receive all required meal breaks. These managers, the 60 investigators, my apologies, these 62 span levels one through six of the field investigator position. And like I said, they report to field managers who report to a single regional manager. Now, in addition to the evidence that we have that came in through those interrogatories, six of them were deposed per an order of the magistrate judge as to who be deposed. That's a docket 218. And then we have the common evidence. And going to knowledge, here's the... Wait a minute. Before you get to knowledge, what about the rest of the class? So... I mean, we're talking, am I correct? We're talking about around 400. We are talking about 400. What do we know about, I mean, we have affidavits from 64, but do we know anything about the 336? We know this. They worked the same job. They worked under field managers that reported to the same regional manager. We know that they use the same timekeeping systems. Yeah, but what evidence did you present for classification by way of statistical analysis or extrapolation or really anything similar, for example, to what was done in Tyson Foods to show that there is a way on a class-wide basis to show that maybe not all 400, but most of them worked unpaid overtime or skipped breaks? So with respect to Tyson, Tyson says that it is not going to set a threshold or any kind of rule as to what statistical significance may be required in a class action. And in fact, Duran, which Key Point points to, has not done that either. Rather, courts look at the quality of the common evidence, not the quantity. This circuit in the Garcia case, for example, in another Wage and Hour case... I didn't ask for case citations. I was asking for what showing you made. So, yes. Other than the interrogatories. Other than the interrogatories, other than the testimony of the regional managers, the regional manager, the testimony of the field managers, we have people submitting things through a system, an electronic system that Key Point has. We have HR records. What are these things? Sure. So first, let me talk about the HR records. These HR records are emails of verbal and actual written discipline records, as well as HR exit interviews. There's a single HR department here. And they are getting, in writing, people saying it takes too long to do the job. People are working for free. You cannot... The workload is unrealistic. We have those emails and those exit interviews. Those are part of the record. We have people getting demotions for not meeting their production metrics. We have, for example, emails that talk about the daily life of a field manager and checking in regularly with the people that they are supervising. So that type of common evidence is company-wide and certainly California-wide when we're talking about a class. And because it is impractical to have every single class number, all 400 people, come in in a wage and hour action and say, yes, I worked overtime, or yes, I missed a meal break. We look at whether it is common enough, whether those issues predominate enough for a class to be certified because of the common evidence. And common evidence does not just mean class first. You said there's no legal definition of common enough. Can you give us a parameters? Would 50% be common enough? Certainly. So I... Yes, it would be? I think it would be common enough in certain circumstances. Here we are talking about company culture that resulted in people working off the clock. Are there any cases that have said 50% isn't enough? I have a couple cases I can point you to. One is the Garcia case in the 10th Circuit where five of approximately 7,000 class members testified in a Donning and Dauphin case. And this circuit said... Well, they didn't say it was 50%. They only had actual testimonies of you. But I'm curious if you had testimony, if somebody said, yeah, about half my workers are able to do it and about half are not. I mean, I'm talking about are there any cases with some evidence that shows that about a 50% effect rate is enough? Not in the way that you are describing, Judge. But there's evidence in the record? Here, there is not evidence in the record as to each and every class member. I think we would be hard-pressed at a discovery stage to be able to receive that. But the thing that binds the class, which the jury will be asked for a yes or a no on, is whether these production metrics resulted in people working off the clock. And there is a breadth of common evidence here from the class members that submitted interrogatories from the common evidence, including emails where managers are saying things like, you cannot use your overtime to catch up. And so you wonder, well, then if everybody is saying in these exit interviews that you can't get the work done in 40 hours, how is it getting done if you can't use recorded overtime to do it? And those are intensely practical considerations when the whole record was presented to Judge Martinez that he had to consider. Let me question you about that. He said he's deciding this assuming the truth of all the allegations of the complaint. That's wrong, right? You have to look at the facts under Walmart. You do have to look at the facts. And he didn't, and he didn't explain how the facts support it, did he? I disagree. And the reason I disagree, Judge Hartz, is at page 7892 of the appendix going into page 7893. In terms of talking about relying on the sufficiency of the allegations or deferring to the allegations, all that meant in this context was that he wasn't going to decide who wins on the merits. And we know that because he goes on to say it may well be that plaintiffs will be unable to prevail on their California claims at trial. However, at this stage of litigation, the court must confine itself to questions relating to whether common questions drive resolution, and then goes on on the next page to say that plaintiffs have adequately established their claims depend on common contentions that are such a nature that they are capable of class-wide resolution. But he didn't explain that. He didn't go into the specific evidence. That seems, he says, at this stage of the litigation, the court must confine itself to the resolution of plaintiff's claims, and as a consequence, accepts the substantive allegations of the complaint as true. That's a pretty clear statement by the judge. I don't know how you can read it any other way than saying in determining predominance and commonality, he's looking at the complaint. Where does he discuss, does he at some point give a discussion of the evidence and explain based on that that there's predominance? The first five pages of the opinions fact section do talk about that evidence. That's factual background. Does he analyze that? Does he use that? Does he explain how those facts that he's, the evidence that he's summarized compels or leads him to the conclusion that there's commonality and predominance? Yes, on page seven, eight, nine, three, he says, to the extent the jury determines, this is not seven, eight, and nine, seven and eight, nine, and three. It's 7,893. Very long record. He says, to the extent that the jury determines that plaintiffs have failed to establish the existence of an alleged unlawful policy, then all of class members' claims would fail in unison. And this is why those first five pages of facts are important. It's because he picks up on Key Point's main defense, which is uniform across the board and applies to every class member, which is that they are saying they did not have an unlawful policy. So he states all the facts and they draw some conclusions. I didn't give any analysis of why he draws that conclusion. That's what it sounds like to me, which I'm not sure satisfies Walmart. Well, I think we can look at the facts that he focused on. We can look at the fact that he is citing Falcon, which talks about probing beyond the pleadings. He's citing this circuit's opinion in Treviso and Montreal, which talk about how these are intensely factual questions. This judge knows the law and he said what he did in saying that he considered all of the arguments and evidence as well as the case law. And I see you shaking your head, Judge Hartz. I can read that and see, but he may be the most learned, thoughtful judge in the world on this, but he's got to explain it. Yeah. Could I just ask you, if we were to decide that the court erred in certifying the damages issue but did not err in certifying the liability issue, what should happen next? I think you would remand with instructions, Your Honor. I believe that in the opinion, Judge Martinez talks about how he is considering bifurcating liability and damages. And so I think, you know, this court's opinion or Tenth Circuit in Wallace v. Roderick talks about those issues are really trial management and case management issues. And I think, you know, we're not sure. All right. I've got a harder one for you. What if we thought that the district court erred in certifying on overtime but didn't err in certifying on meal and rest breaks? Then what would have to happen? I think it's a partial affirmance. We can split those up on appeal. I believe so. On the point of meal and rest breaks, I just want to highlight that the question is whether the employer provided a reasonable opportunity. That is a yes or no question. And the case law, including the ones that defendant cites, talk about how if some people took a break, that does not answer the question in the affirmative for the defendant. I see that I'm out of time, and I realize the court did not have any questions on arbitration, so. Well, I think we should pursue that. You can sit down because you're not going to talk about arbitration. But thank you. I didn't mean to just. But let's hear from each side three minutes on arbitration. You should have discussed that first. OK, go ahead. Go first and then. And this isn't because any of you are entitled to this, but I think we should hear a little bit about the arbitration issue. Thank you, Your Honor. I'm going to cut you off at the second on three minutes. Yes. You can even throw something at me if you wanted, Your Honor. No, no, don't give him that permission. He's afraid I'd aim at you and hit him. With respect to the FAA appeal, this exam is a juror de novo standard, according to Belknap, whether the district court erred when it ignored biding precedent in permitting the California plaintiffs to avoid their obligation to arbitrate their claims against the company under the Federal Arbitration Act. Let's talk about California people. I'm a little bit concerned about why the district court said that the California class was included under the Was that a proper thing for the court to decide? It was not, Your Honor. They had no authority to do so. In this case, the arbitration, the the arbitration agreement has a clear and unmistakable delegation clause because interpretation of the pending litigation exception is clearly part of the issues delegated to the arbitrator. The district court had no authority to decide that. So what do you do with that? That's a fairly discreet error, but how do you cope with that? What should the court have done? So the court should have stricken those individuals. What should we do? You should rule that the motion to compel arbitration, denying it, was improper and send all of those individuals who are subject to arbitration should be stricken from the case and notice should not go to them if in fact, Your Honors, incorrectly decide that the Rule 23 class should have been certified. Because at the end, sorry, Your Honor. No, no. Because I think Your Honor is going to. You answered perfectly well. I understand it. I'm very satisfied. Thank you. Okay. And with respect to, you know, so the delegation clause delegates all of these issues to an arbitrator. The district court had no authority to do that. What the district court had authority to do was to decide whether or not there was a valid class action waiver. And it did so. Whether or not the agreement itself was enforceable. And it did so. Everything else in this case was delegated to the arbitrator. And so whether or not these individuals should be subject to arbitration, even including with respect to the pending litigation clause, should go to whatever arbitrator decides that issue. And your authority for that is bailman. Are you saying that this is a matter of federal law? Has there been any discussion of that? Have the parties agreed that the law we look to in determining whether it's arbitrable or not is federal law? I don't believe there's any dispute on that, Your Honor. Both Belknap and Schein would give us this result that arbitrability should go. I don't think that the parties in this case ever argue to the contrary that it's not the specific cases you're citing, but that we're deciding is a matter of federal law. Is that? And I apologize, Your Honor, if I'm not understanding your question. Thank you for your time, sir. Okay. Thank you. Thank you for hearing me, Your Honors. May it please the court, Caroline Bressman for plaintiff's appellees. The court did properly decide that no clear and unmistakable evidence of delegating the issue of arbitrability to an arbitrator existed. And what law did the judge apply in deciding that? Was it federal law? Did it look at Belknap? What precedent was it looking at? The court looked to the Supreme Court's decision in first options. Both parties have cited to that case as the height for the hygiene standard that there must be clear and unmistakable evidence of delegating arbitrability. Here, there is no such clear and unmistakable evidence. The language of the pending litigation exception starts with saying, notwithstanding any other language in this agreement, the agreement does not apply to pending litigation. Notwithstanding means any other language in this agreement, including the delegation clause. At best, for key point, that those two phrases conflict such that there is no clear and unmistakable evidence. But if anything, what is clear is that that issue remains in the hands of a federal court, not with the arbitrator. In terms of the applicability of the pending litigation exception, it does apply to California class members who signed agreements as of March 8, 2018, because the Brayman litigation was pending as of that date, and class members in California were also purported members of the pending FLSA collective action. Therefore, the exception applies to California class members as of March 8, 2018. So you think that the court did not err in deciding that the California class was included in that pre-existing litigation exclusion? The court did not err in making that finding correct. Because it was a question of law? I mean, why wasn't that a question of the scope of the arbitration? And why didn't the arbitration agreement not cover that, which said that is something the arbitrator should decide? So if I'm following your question, the applicability of the pending litigation exception itself, that's a question for the court. Because you say it's a question of law as to submission. It's not a question of law. More so, it's a question of what did the parties agree to in this arbitration agreement. Because the pending litigation exception begins with saying, notwithstanding anything else in this agreement, the agreement does not apply to pending litigation. That includes, this agreement does not, notwithstanding. But isn't there a provision in there that the arbitrator should decide what is included and isn't included? In the arbitration? Could you repeat that, please, Your Honor? Isn't there a provision in there that says the arbitrator has the task of deciding what is and is not submitted to arbitration? There is a separate delegation. Time's up, but I'll let you answer the question. Thank you, Your Honor. If Judge Ebel has further questions, you can respond to them. There is a separate delegation clause that says that. But then at the same time, the pending litigation exception carves itself out from the delegation clause. Or creates a complex such that there's no clear and unmistakable evidence. Do you want to pursue that? No. Thank you, Your Honors. Time has expired. Counsel are excused.